1.
2.
THE HONORABLE JOHN C. COUGHENOUR
3.
4.
5.
UNITED STATES DISTRICT COURT
6.
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7.
| LINDEZA INTERNATIONAL, LTD., a Bermuda corporation, and MAXWELL and MARJORIE WARD, husband and wife, Plaintiffs, v. DELTA MARINE INDUSTRIES, INC., a Washington corporation, and LEVITON MANUFACTURING COMPANY, INC., a Delaware corporation, Defendant. | Case No. C07-1479 JCC |
|---|---|
| | PLAINTIFFS' OPPOSITION TO DEFENDANT DELTA MARINE INDUSTRIES' MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT |
| | **Note On Motion Calendar:** **March 15, 2010** |

8.
9.
10.
11.
12.

13. **I.    INTRODUCTION**

14.     Defendant Delta Marine Industries (hereinafter "Delta") filed a Motion for Partial

15. Summary Judgment on the issues of limitation of its liability and Plaintiff Lindeza

16. International's duty to defend and indemnify.  Plaintiffs Lindeza and Ward hereby oppose that

17. motion, and file a Cross Motion for Partial Summary Judgment.

18. **II.    BACKGROUND**

19.     MARJORIE MORNINGSTAR was a 142' motor yacht owned by Lindeza International

20. for the benefit and enjoyment of Maxwell Ward.  *See* pre-fire photos, Barcott Decl., as Exh. A.

21. On December 21, 2006, she was delivered into the care, custody, and control of Delta by her

22. captain, Shaun Preacher, for purposes of major repairs.  On March 31, 2007, while being work

23. on by Delta employees, and with her major systems disabled and removed, MARJORIE

24. MORNINGSTAR caught fire.  Delta now moves (over 2 years from the commencement of this

25.
26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 1
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. lawsuit) to limit is liability to a mere $300,000 for the loss of a vessel which had an insured

2. value of $7.5 million.

3.      The Repair Yard Order which is the subject of this Motion was signed by Capt. Preacher

4. upon delivery of MARJORIE MORNINGSTAR on December 21, 2006, at which time title and

5. risk of loss passed to Delta. *See* Repair Yard Order, attached to Barcott Decl. as Exh. B;

6. Preacher Dep., at 40:5, 80:21-25, attached to Barcott Decl., as Exh. C.  MARJORIE

7. MORNINGSTAR was in Delta's complete care, custody and control from December 21, 2006

8. through and including its destruction by fire on March 31, 2007.  Delta's failures and missteps

9. during that time were numerous, and directly caused and contributed to the start of the fire, and

10. its propagation.

11.      One of the extensive projects undertaken by Delta Marine included the replacement of

12. her generators and related overhaul of her electrical system. The "lead electrician" doing this

13. electrical work aboard MARJORIE MORNINGSTAR was Matthew Sinclair.  Mr. Sinclair's

14. boss was Jeff LeBlanc. *See* Sinclair Dep., at 9:18, attached to Barcott Decl., as Exh. D.  In

15. performing work (incomplete at the time of the fire) on the electrical system, Mr. Sinclair chose

16. to disconnect the vessel's shore power isolation transformer, a safety device which limits

17. damaging electrical surges and spikes and protects the vessel's electrical system. *See* Sinclair

18. Dep. at 79:23-80:12; Preacher Dep., at 100:15-101:20.  On the day of the fire, and at the

19. completion of Mr. Sinclair's shift, he purposely bypassed the isolation transformer and

20. connected Delta's shore power supply directly to the vessel's electrical sub-panel (thereby

21. feeding the shore based power supply directly to the vessel without the benefit of the isolation

22. transformer's protection). *See* Sinclair Dep., at 76:9-15; Preacher Dep., at 100:15-101:20.  Mr.

23. Sinclair undertook this action even though he admittedly did not know the purpose of isolation

24. transformers. *See* Sinclair Dep. at 64:2-12.  To make matters worse, according to Mr. Sinclair,

25. his supervisor knew the isolation transformer had been bypassed, but did nothing about it

26. PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 2
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. (despite his understanding that an isolation transformer is a safety device. *See* Sinclair Dep. at

2. 79:23-80:12. Sinclair's supervisor, Jeff LeBlanc, admitted he did not check the shore power

3. connection. *See* LeBlanc Dep. at 28:18-21, attached to Barcott Decl., as Exh. E.

4.       Not only did Sinclair bypass the isolation transformer, but his poor connection of the

5. shore power cord to the vessel's electrical sub-panel further contributed to the fire. Specifically,

6. the ground connection of the temporary shore power cord ground conductor was loosely

7. wrapped onto the threads of a bolt on the ground bus inside the power distribution cabinet in the

8. engine room. The ground connection on the second temporary shore power cord was merely

9. twisted with the other ground conductors without the benefit of a connector. One of the phase

10. connections held together by a split bolt fell apart when the insulating tape was removed. *See*

11. Liem Report, at 9, attached to Liem Decl; *see also* Barcott Decl., ¶ 10 (regarding signature for

12. Liem Declaration).

13.       Additionally, Delta disconnected the vessel's functioning fire alarm and smoke detection

14. systems. *See* Preacher dep., at 59:19-60:20; 94:22-96:5; 124:1-5. Workers from Delta removed

15. overhead panels in order to run new electrical wires from the bow and stern to the engine room.

16. *Id.* at 59:19-60:20; *See also* Carman Report, attached to Carman Decl., at 1-2. This was the

17. vessel detection system which, when sounding, can be heard not only throughout the vessel but

18. from outside as well. *See* Preacher Dep., at 180:12-181:9 Delta could have put a temporary fire

19. alarm system in place or had a fire watch, but did neither, as required by OSHA 1915.501 and

20. recommended pursuant to good marine practice as reflected in NFPA 312 Standard. *See* Faherty

21. Report, attached to Faherty Decl., at 3-4; Sinclair Dep., at 70:1-3 (testifying he did not know

22. anything about fire alarms on the vessel); Delta's Responses to Plaintiffs' 1st ROG and 2nd RFP,

23. attached to Barcott Decl. as Exh. F (admitting it did not have a fire plan and that it recently

24. purchased a temporary hard wire fire alarm systems that allows it to evacuate a vessel in case of

25. fire). Additionally, Delta did not have an OSHA required written fire safety plan nor did it

26. PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 3
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. provide its employees with fire training, which worsened the effects of the fire (despite its

2. assertion that following OSHA is its policy).  *See* Faherty Report, attached to Faherty Dec., at 4;

3. Delta's Responses to 1st ROGS and 2nd RFPs, Interrogatory No. 1; LeBlanc Dep., at 42:8-16,

4. 43:14-20; Heys Dep., at 49:1-8, attached to Barcott Decl. as Exh. G.

5.      Sinclair's errors were exacerbated by Delta's complete lack of oversight, training, and

6. assurance that Sinclair was appropriately experienced to conduct the work in which he was

7. engaged on MARJORIE MORNINGSTAR.  Delta states that it only does base line electrical

8. work and relies on the experience of its electricians to perform these routine tasks.  If an unusual

9. or extraordinary task needs to be completed, Delta Marine obtains a subcontractor to perform the

10. task and instruct Delta Marine electricians.  New employees' work is inspected by more

11. experienced electricians until such time as the new electrician is determined to be proficient at

12. the work the electrician is to complete.  *See* Delta's Responses to 1st ROGS and 2nd RFP,

13. Interrogatory No. 21.  Despite this "policy", LeBlanc, did not check the shore power connection

14. made by Sinclair.  *See* LeBlanc Dep., at 28:18-21; Sinclair Dep. at 78:20-25.

15.      Sinclair's employment application clearly reflects that Delta was not aware of, nor

16. investigated, Sinclair's educational background, training, apprenticeships, skills, job-related

17. training, employment history and experience, other qualifications, specialized skills, basic

18. mathematic skills, nor is there evidence that he was even interviewed by Delta.  Rather it was a

19. "friend" referral for the position of electrician by his supervisor, LeBlanc, who worked with

20. Sinclair at a prior job at Sinclair Electric.  *See* Application of Employment for Sinclair &

21. LeBlanc, attached to Barcott Decl. as Exh. H.; Sinclair Dep.at 7:19-20.  More surprisingly, Delta

22. claims that its policy and procedure in regard to connecting a vessel to shore power is to "leave

23. the decision to connect to shore power to the owner of the vessel.  Delta Marine generally

24. connects to the shore power through the existing shore power system.  However, when the shore

25. power system connection cannot be used, Delta Marine will hard wire the shore power into the

26. PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 4
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. breaker box if requested by the Captain." *See* Delta's Responses to 1st ROGS Interrogatories
2. and 2nd RFP, Interrogatory No. 2.  Despite this "policy" both LeBlanc and Sinclair admit that
3. Captain Preacher did not dictate to Delta what was supposed to be done with the electrical
4. system and how it was to be done.  LeBlanc at 34: 20-22; Sinclair at 75:21-24.

5.     In short, on March 31, 2007, while the fire alarm and smoke detector systems were
6. disabled, and while the isolation transformer was being bypassed, Sinclair re-connected the
7. shore power and walked away.  Sinclair Dep., at 21:8-22:14.  A power spike surged through the
8. ad hoc electrical system created by Delta and ignited the Leviton receptacle, which spread to
9. other materials being stored in the exercise room by Delta. MARJORIE MORNINGSTAR was
10. rendered a constructive total loss with an insured value of $7.5 million.  Plaintiffs Lindeza and
11. Ward filed suit against Delta and Leviton on September 21, 2007, (as required by Delta six
12. month notice provision in its Repair Yard Order) to recover for the loss of their vessel and its
13. contents.  Although the fire occurred almost three years ago and suit was commenced two and a
14. half years ago, Delta only recently attempted to enforce a provision in the Repair Yard Order
15. limiting its liability to $300,000.

16. ### III.    ARGUMENT

17.     Summary judgment is proper when "the pleadings, depositions, answers to
18. interrogatories, and admissions on file, together with affidavits, if any, show that there is no
19. genuine issue as to any material fact and that the moving party is entitled to judgment as a matter
20. of law." Fed.R.Civ.P. 56( c).  An issue is genuine only if there is a sufficient evidentiary basis on
21. which a reasonable fact finder could find for the non-moving party, and a dispute is material
22. only is if could affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby,*
23. *Inc.*, 477 U.S. 242, 248- 49 (1986).  The plaintiff's evidence, taken as true, must be sufficient to
24. permit a reasonable trier of fact to find in his favor with respect to any element of his claim on
25. which he bears the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
26. PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 5
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. Under the undisputed facts of this case, Plaintiffs are entitled to summary judgment holding that

2. Delta's liability is not limited to $300,000, and Lindeza is not obligated to defend or indemnify

3. Delta against any claims for indemnification made by Leviton

4.     In the alternative, should the court find that Plaintiffs are not entitled to summary

5. judgment, Delta's summary judgment should be denied because there exist genuine issues of

6. material fact relevant to its motion.  Summary judgment is not warranted if material issues of

7. fact exist for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied,

8. 516 U.S. 1171 (1996).  Should the court find that the limitation provision applies, there is a

9. genuine issue of material fact as to whether Delta acted grossly negligent, which is conduct for

10. which liability cannot be limited.

11. **A.     The Limitation of Liability Provision.**

12.     Delta argues that paragraph 6(d) of the Repair Yard Order applies to limit its liability to

13. $300,000.  Delta has simply misread the very words of its own form contract.  The language of

14. the agreement does not call for limitation of liability in this instance.

15.     Assuming, however, the court finds that the limitation clause might apply, Delta's

16. motion for summary judgment should be denied.  Limitation provisions do not apply to gross

17. negligence, and there is substantial evidence that Delta acted with gross negligence in this case.

18.     **i.    Summary Judgment should be Granted in Favor of Plaintiffs because, under the Undisputed Facts, the Limitation Provision does not Apply.**

19.     Under the terms of the agreement itself and applicable law, interpretation of the Repair

20. Yard Order is governed by general maritime law.  Paragraph 11 of the agreement provides:

21.     These terms, conditions and covenants shall be governed by and construed in
22.     accordance with the general maritime law of the United States, insofar as
        applicable, and otherwise by the laws of the State of Washington.

23. Repair Yard Order.  Choice of law provisions such as this are enforceable.  *Great Lakes*

24. *Reinsurance (UK) PLC v. Durham Auctions Inc.*, 585 F.3d 236, 242 (5th Cir. 2009).

25.

26.
PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 6
Case No. C07-1479 JCC

In addition to the choice of law provision, the claim against Delta is governed by federal maritime law. A contract to repair a vessel is a maritime contract. *North Pacific Steamship Co. v. Hall Brothers Marine Railway & Shipbuilding Co.*, 249 U.S. 119 (1919); *Hall-Scott Motor Car Co. v. Universal Ins. Co.*, 122 F.2d 531, 534 (9th Cir. 1941). Federal law governs the construction of the terms of the repair contract and also governs the standard of performance due under the contract. *Booth Steamship Co. v. Meier & Oelhaf Co.*, 262 F.2d 310 (2d Cir. 1958); *Southpoint Transit*, 234 F.2d at 955.

Courts interpret maritime contracts, as they do other contracts, by looking first to the intent of the parties as expressed by the terms of the agreement. *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986). "Contract terms are to be given their ordinary meaning," and "[w]henever possible, the plain language of the contract should be considered first." *Starrag v. Maersk, Inc.*, 486 F.3d 607, 616 (9th Cir. 2007). The contract should be read as a whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous. *Fontenot*, 791 F.2d at 1214. To the extent possible, all terms of the contract should be interpreted in a manner such as to avoid rendering any of them meaningless or superfluous. *Starrag*, 486 F.3d at 616 (quoting *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004)).

Under maritime law, to be enforceable, a limitation clause must be expressed clearly, and be unequivocal. *See also Ildhuso Fisheries, Inc. v. Nichols Bros. Boat Builders, Inc.*, 1 Fed. Appx. 659, 660 (9th Cir. 2001). ("For a liability disclaimer to be enforced, the contract provision must be clear, unequivocal, and reflect the intent of the parties.); *Edward Leasing Corp. v. Uhlig & Associates, Inc.*, 785 F.2d 877, 889 (11th Cir. 1986). "[C]lauses that purport to limit a party's legal responsibility are strictly construed and the given effect must clearly express the intent of all parties whose liability is altered by the agreement." *Nathaniel Shipping, Inc. v. General Elec. Co.*, 920 F.2d 1256, 1266 (5th Cir. 1991).

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 7
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1.   If enforceable, only the precise terms of a limitation clause will be enforced; a court

2. cannot broaden the meaning of the clause beyond the words themselves. *See, e.g. Ildhuso*

3. *Fisheries*, 1 Fed. Appx. at 660. *See also Morton v. Zidell Explorations, Inc.*, 695 F.2d 347, 349

4. n.1 (9th Cir. 1982), *cert. denied*, 460 U.S. 1039 (1983); *Offshore-Inland Servs. of Ala., Inc. v.*

5. *R/V Deepocean Quest (ex Nadir)*, 2007 U.S. Dist. LEXIS 73534 (W.D. Wash. Oct. 2, 2007).

6.   There are several provisions which relate to Delta's liability in this case. A careful

7. review of the language of these provisions, however, demonstrates that there is no exculpation

8. or limitation provision applicable to the facts of this case. Plaintiffs are thus entitled to

9. summary judgment holding that there is no limitation to Delta's liability.

10.    **1. The Contract as a Whole/An Overview.**

11.   Prior to looking at each potentially relevant provision, it is necessary to review all three

12. relevant provisions together. *Fontenot*, 791 F.2d at 1214 (stating a contract should be read as a

13. whole); *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 910 (9th Cir. 2003) (same). In so doing, it is

14. clear that Delta intended to address its liability in two distinct scenarios: (1) when something

15. occurs while the vessel is in Delta's yard and in its care, custody and control during ongoing

16. work; and (2) when something occurs *after* work has been completed and during the six month

17. warranty period. *See* Repair Yard Order.[1]

18.   Paragraph 4 addresses the yard's assumption of responsibility for damage to the vessel

19. sustained while in the shipyard as a result of fire, theft, acts of God, etc., that are within the

20. control of the yard. Paragraph 5 and most of 6 address problems with the installation/repairs

21. Delta completed that are noticed after the vessel has left the yard. Paragraph 6 also includes

22.

23.

---

24.  [1] For the court's convenience (because the original is difficult to read) the relevant paragraphs have been retyped

25. and attached with the Repair Yard Order as Exhibit B to the Barcott Declaration. Portions relevant to the following
  discussion are in bold.

26. PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
  AND CROSS-MOTION FOR PARTIAL S.J. - 8
  Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

indemnification provisions for unpaid subcontractor services, and damage/injury caused by the vessel owner.

Comparing and contrasting all three paragraphs, reveals two overlying themes. First, paragraph 4 relates to damage that occurs while in the shipyard's control and while work is ongoing, while paragraphs 5 and 6 refer to problems noticed after the vessel has left the shipyard's control and the work is competed. The meaning of paragraph 4 is evident from the "beyond the control of the Yard" language. This language would be unnecessary if the paragraph referred to a time after the vessel left the shipyard's control. *Starrag*, 486 F.3d at 616 (avoid superfluous meanings). Paragraph 4's reach is further illustrated by the discussion referring to delay caused by such events. Delay can only be caused if the work is not yet done. *Id.* (terms should be interpreted in a manner to avoid being meaningless).

On the other hand, paragraphs 5 and 6 use language indicating they apply only to problems with the work alleged after the work is completed. Paragraphs 5 and 6 use phrases like "repairs and work performed," "equipment installed," "alleged negligent installation," "redelivery of the Vessel," and "work done." These paragraphs require that the vessel owner notify the shipyard of problems with the work within six months after the work is completed, and that the vessel owner prove that the equipment in question was maintained and operated properly. These provisions would be meaningless if the vessel were still in the shipyard's control and the work had not yet been completed. *Starrag*, 486 F.3d at 616 (stating that terms should be interpreted in a manner to avoid being meaningless).

The second theme revealed when comparing the paragraphs is that paragraph 4 relates to damage done to the vessel as a whole, regardless of whether it relates to the work being done, while paragraphs 5 and 6 relate to problems with the specific work Delta performed. Paragraph 4 expressly states "damage to the Vessel," while paragraphs 5 and 6 refer only to "equipment installed," "machinery, equipment, or parts," and "negligent installation." *Starrag*, 486 F.3d at

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 9
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. 616 (contract terms should be given their plain meaning); *Flores*, 335 F.3d at 910 (same).

2. Moreover, paragraph 5 requires redelivery of the vessel for "replacement, repair, or adjustment

3. of the alleged negligent installation." Attempting to apply this to the damages contemplated in

4. paragraph 4 simply does not work. Repairing negligent installation will not remedy theft, fire,

5. or an act of God. Paragraph 4 contemplates an entirely different type of damage than that

6. contemplated in paragraphs 5 and 6.

7.         **2.     Paragraph 4: Loss/Damage.**

8.        In relevant part, paragraph 4 of the Repair Yard Order states that the "Yard is not

9. responsible for loss or damage to the Vessel or articles left on the Vessel in the case of . . . fire

10. or any other cause **beyond the control of the Yard**." (Emphasis added). It applies to damage

11. done "to the Vessel" as opposed to discreet machinery, equipment or parts. *See* discussion

12. *supra* III.A.i.1. comparing paragraphs 4 with 5 and 6. This is the only contractual provision in

13. the agreement that mentions loss by fire. By its very terms, this clause does not exculpate Delta

14. from responsibility for fire damage when Delta causes or contributes to the cause in any manner

15. and loss or damage results. Indeed, this clause clearly establishes that Delta is responsible for

16. fire damage or loss caused by any factor(s) under its control; its actions need not even rise to the

17. level of negligence. Under any reading, paragraph 4 does not limit Delta's liability where the

18. cause of the fire was under the control of Delta.

19.        Notably, this paragraph does <u>not</u> say "cause beyond the <u>sole</u> control of the Yard." It is

20. significant that the word "sole" has been left out of this provision. "Sole" was used elsewhere in

21. the agreement, and could have been used here, but was not. *See* paragraph 5 ("limited solely, at

22. the Yard's sole discretion") and paragraph 6 ("unless proximately caused solely by the

23. negligence or willful misconduct of the Yard). Thus, under the plain meaning of the provision,

24. even a fire that has multiple causes or contributing causes, only one of which is the Yard, the

25. Yard is still liable.

26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 10
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1.    In this case, the cause of the fire was most definitely within the control of Delta.  The

2. MARJORIE MORNINGSTAR came equipped with an isolation transformer that reduced spikes

3. in power transmitted to the vessel.  *See* Sinclair Dep. at 79:23-80:12; Preacher Dep., at 100:15-

4. 101:20.  Delta chose to bypass this equipment, thereby exposing the vessel to random spikes in

5. currents pulsing through the vessel's power system.  *See* Sinclair Dep. at 79:23-80:12; Preacher

6. Dep., at 100:15-101:20.  The spikes in power caused the receptacle to fail.  Liem Report, at 9,

7. attached to Liem Decl.  In addition to bypassing the isolation transformer, the workmanship in

8. connecting to power to the vessel was poor.  *See* Faherty Decl., ¶ 4; Carman Decl., ¶ 5.  This

9. system was created by a Delta electrician who had no idea of what an isolation transformer was.

10. *See* Faherty Decl., ¶ 4; Carman Decl., ¶ 5.  His supervisor expected him to know what this piece

11. of equipment did.  *See* LeBlanc Dep. at 28:18-21.  Not only were Delta's actions in regard to the

12. electrical system a direct cause of the fire but Delta also directly contributed to its severity and

13. propagation.  Delta disabled MARJORIE MORNINGSTAR's fire and smoke detection systems,

14. and did not implement a shore-based system or fire watch program, which left her exposed to

15. greater fire destruction.  Faherty Report, generally; Carman Report, generally.  Had a fire

16. warning system or fire watch been in place, the damage suffered by MARJORIE

17. MORNINGSTAR would have been significantly less.  It is indisputable that under paragraph 4

18. Delta accepts responsibility for loss/damage to MARJORIE MORNINGSTAR because (1) the

19. cause of the fire damage was within the control of Delta; and (2) the fire occurred when the

20. vessel was within Delta's care, custody and control and possession and risk of loss was with

21. Delta.  Paragraph 4, on its face, does not limit Delta's liability therefore, but rather, Delta

22. explicitly accepts liability for it.

23.    Moreover, that Leviton may have contributed to the cause of the fire (through its

24. defective receptacle), does not eliminate Delta's liability for fire damage under its control.  As

25. discussed above, the terms of paragraph 4 do not require that Delta have "sole" control in order

26. PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 11
Case No. C07-1479 JCC

1. to be liable for fire.  Even being partly in control satisfies the terms of this provision.  Had Delta

2. wanted to limit its responsibility for fire in that manner, the provision had to have said "beyond

3. the sole control of Yard," which it did not.  At the conclusion of paragraph 4, therefore, Delta

4. has deemed itself responsible for fire damage to the vessel if it was caused by events under its

5. control.  The question, then, is whether later paragraphs limit that liability.  Clearly they do not.

### 3.    Paragraph 5: Limited Warranty and Exclusive Remedy.

Paragraph 5 of the Repair Yard Order seeks to limit Delta's liability for negligent

installation discovered after completion of the work:

> (A) Yard warrants to Owner . . . that all repairs and work performed hereunder will be free from defects in material and workmanship and conform to applicable express specifications for **six (6) months from the date work under this Contract is completed**.  (B)  Yard's warranty with respect to all Owner-furnished equipment installed aboard the Vessel by Yard shall be strictly limited to workmanlike installation in accordance with good marine practice. . . .

> Yard's liability, and Owner's exclusive remedy for breach of any warranty for negligence, strict liability, or otherwise (regardless of legal theory) is limited solely, at the Yard's sole discretion and the designated place of business where practicable, to the **replacement, repair, or adjustment** of the alleged negligent installation as the case may be, where the work is proven to be other than as warranted.  Owner shall be responsible for redelivery of the Vessel to such repair location. . . .

Repair Yard Order (emphasis added).  Paragraph 5 provides an express limited warranty which

provides that Delta's work will be free from defects in material and workmanship, and obligates

Delta to replace or repair the <u>negligent</u> <u>installation</u> where the work is other than warranted.  As

discussed above, this paragraph contains "post-completion" language.  *See supra* section

III.A.i.1.  Its target is liability for work <u>completed</u> by Delta that the vessel owner feels was

improper or defective *after* delivery of the vessel to the owner (and when title and risk of loss

returns to the owner).  It does not address liability for work that is <u>ongoing</u>.

This provision does not apply to the facts of this case.  Delta did not install the receptacle

that caught fire, nor was the receptacle being worked on.  The second paragraph makes clear that

this provision does not contemplate the destruction of the vessel as it requires the vessel to be

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 12
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. returned to the yard for such warranty work.  The only remedy contemplated is "replacement,

2. repair, or adjustment" of the item for which installation was less than warranted.  It is

3. impossible to apply that remedy to the destruction of a vessel through fire.

4. Nothing in this clause envisaged the situation here where the means and manner of

5. conducting incomplete work causes other damage.  Unlike paragraph 4, which broadly refers to

6. "damage to the vessel," this paragraph refers to "the negligent installation."  By its own terms,

7. this paragraph is significantly narrower than paragraph 4 and does not apply to damage done to

8. the vessel while in the yard.

### 4.   Paragraph 6(b): Limitation of Warranties and Damages: Exculpatory Clause for Consequential Damages.

Clause 6(b) of the contract clearly states that the

> YARD SHALL NOT BE LIABLE UNDER ANY CIRCUMSTANCES . . . FOR ANY CONSEQUENTIAL, SPECIAL, CONTINGENT OR INCIDENTAL DAMAGES ARISING OUT OF, CONNECTED WITH, OR RESULTING FROM THIS CONTRACT. . .  INCLUDING BUT NOT LIMITED TO, ANY LIABILITY FOR LOSS OF PROFIT OR REVENUE, LOSS OF USE, COST OF SUBSTITUTED EQUIPMENT, DETENTION, DEMURRAGE, SALVAGE, TOWAGE, PILOTAGE, OR CLAIMS OF THIRD PARTIES.

Repair Yard Order (caps in original).  Plainly stated, this provision says Delta will not be liable

for consequential damages.  Expressly missing from this clause is any reference to compensatory

damages.  This interpretation is bolstered by the list of types of damages that it disclaims, which

are all generally considered to be consequential.  Like paragraph 5, paragraph 6(b) addresses

liability for work completed by Delta that the vessel owner feels was improper.  It does not

address liability for work that is ongoing.  *See supra* section III.A.i.1.

There is no claim for consequential damages being made here.  Plaintiffs are not suing

for loss of profit or revenue, loss of use, cost of substituted equipment, etc., or any other form of

consequential damages that might flow from the destruction of the MARJORIE

MORNINGSTAR.  Under the doctrine of *ejusdem generis*, Delta's listing of specific

consequential damages that are not recoverable express its intent that these are the only types of

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 13
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. damages contemplated in this section.  Here, Plaintiffs seek only the value of the vessel, which

2. is not a form of consequential damages.  *See Clow v. U.S. Dep't of Housing & Urban Dev.,* 948

3. F.2d 614, 625 (9th Cir. 1991) (noting that the "request for a replacement home is a request for

4. compensatory relief"); *Galapagos Corp. Turistica "Galatours" v. Panama Canal Comm'n,* 190

5. F. Supp 900, 907 (E.D. La. 2002).  There is absolutely no language in this paragraph of the

6. Repair Yard Order exculpating Delta from liability for direct or compensatory damages.

7.     The Ninth Circuit considered exactly this issue (only in reverse) in *Ildhuso Fisheries,* 1

8. Fed. Appx. at 660.  There, the terms of the warranty provided that the "builder warrants for six

9. (6) months . . . that the work . . . will be free from defects. . . . This does not cover . . .

10. consequential damages which are the result of work accomplished by the builder." *Id.*

11. (omissions in original).  The plaintiff, whose vessel was damaged by fire, admitted that this

12. clause limited liability for damages under the *express* warranty, but argued that it did not limit

13. liability for breach of an *implied* warranty or for negligence. *Id.*  On appeal, the Ninth Circuit

14. noted that the parties could have included a broad exculpatory clause that would have covered

15. all consequential and compensatory damages under any theory of damages, but it did not. *Id.* at

16. 661.  Since the language addressed only consequential damages under the express warranty,

17. exculpation of consequential damages under the implied warranty could not be enforced. *Id.*

18.     The facts of this case require the same treatment as *Ildhuso Fisheries*.  The parties to the

19. Repair Yard Order could have negotiated to include compensatory language, but did not.  For

20. instance, paragraph 6(b) could have said "direct or consequential damages," or "compensatory

21. or consequential damages."  There is ample case law providing examples of such enforceable

22. limitation clauses. *See, e.g. Morton,* 695 F.2d at 349 n.1.

23.     By signing the Repair Yard Order, Lindeza agreed only that Delta would not be liable for

24. consequential damages.  Lindeza did not agree that Delta would not be liable for compensatory

25. damages.  Paragraph 6(b) must be strictly construed. *Nathaniel Shipping,* 920 F.2d at 1266.

26.
PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 14
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. Only the precise terms should be enforced; its meaning should not be broadened beyond what is

2. written in the contract. *See, e.g. Ildhuso Fisheries*, 1 Fed. Appx. at 660. *See also Morton*, 695

3. F.2d at 349 n.1. Under the terms of paragraph 6(b), compensatory damages are not limited.

4.      **5.**     **Paragraph 6(d): Limitation of Warranties and Damages: Limitation of Liability to $300,000.**

5.     Similarly, the language of the limitation clause itself is clear and does not apply to the

6. facts giving rise to this case. Even if the language is deemed ambiguous, its meaning should be

7. construed against the drafter, and Plaintiffs interpretation should be adopted.

8.     **a.**     **The Language of Paragraph 6(d) is Clear and Does Not Limit Liability Here.**

9. Paragraph 6(d) provides:

10. IN NO EVENT SHALL YARD'S AGGREGATE LIABILITY **FOR THE WORK DONE UNDER THIS CONTRACT** TO ALL PARTIES IN INTEREST EXCEED IN THE AGGREGATE THE SUM OF $300,000 OR THE SUM RECEIVED BY THE YARD UNDER THIS REPAIR CONTRACT, WHICHEVER IS LESS.

13. Repair Yard Order (caps in original, underline added). Paragraph 6(d) limits the damages

14. recoverable under the limited express warranty provided in paragraph 5. It addresses liability for

15. work <u>completed</u>, not liability for work that is <u>ongoing</u>. *See supra* section III.A.i.1. This

16. paragraph limits damages exposure expressly for "the work done under this contract." The

17. meaning of these words is plain, clear and critical to its application.

18.     "Contract terms are to be given their ordinary meaning," and "[w]henever possible, the

19. plain language of the contract should be considered first." *Klamath Water Users Protective*

20. *Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 2000). "Work" means "To labor. To perform

21. services." BALLENTINE'S LAW DICTIONARY (1969). "Done" means "Completed." *Id.* By these

22. plain and clear definitions, the meaning of paragraph 6(d) is that liability for warranty claims for

23. the work that has been completed shall not exceed $300,000. This type of language is typically

24. used in contracts for services and refers only to labor and materials. *See, e.g., Spradlin v. Jarvis*

25. *(In re Tri-City Turf Club, Inc.)*, 323 F.3d 439 (6th Cir. 2003) ("payment for work done under

26.

1. this contract will be made on 20-day intervals"); *Danella Southwest, Inc. v. Southwestern Bell*
2. *Tel. Co.*, 775 F. Supp. 1227, 1239 (E.D. Mo. 1991) ("The Contractor is responsible for the safe
3. performance of all work done under this contract."); *James T. Kay Co. v. J. H. Hogan, Inc.*,
4. 1992 Conn. Super. LEXIS 470 (Feb. 25, 1992) ("Agency will pay to the contractor the full value
5. of the work done under this contract less any amounts previously paid.").

6.      In fact, Plaintiffs have been able to find only two cases in the past two decades using
7. similar language in any manner to allocate risk of loss.  In *Johnson v. Richard White Sons*, a
8. Massachusetts state court examined the following indemnity provision:

> The Contractor agrees to indemnify, save harmless and defend the Owner, the
> Owner's agents and the Owner's employees from all damages, claims, demands or
> suits (including reasonable attorneys fees) against said Owner, agents or
> employees or any of them in any manner **arising out of the work done under
> this Contract**, except damages caused by the sole negligence of the Owner.

5 Mass. L. Rep. 223 (Mass. Super. Ct. 1996) (emphasis added).  Significantly, as discussed
below, this provision includes the words "arising out of," which Delta's Repair Yard Order does
not.  In *Smith-Bedrick v. Ford Motor Co.*, the following indemnity language, in relevant part,
was examined:

> Subcontractor will protect, defend, indemnify and save harmless Owner . . . from
> and against all losses, claims . . . of every nature and description brought or
> recovered against the Owner and/or Boone & Darr Inc. caused by or on account
> of any act or omission, negligent or not negligent, of Subcontractor, his agents,
> employees, or subcontractors, **in the course of or in connection with work
> done under this contract.**

2005 Mich. App. LEXIS 29 (Mich. Ct. App. Jan. 11, 2005).  Again, this provision includes "in
the course of or in connection with" which sets it apart from the Delta agreement.  Plaintiffs are
unable to find any case in which the precise phrase "for all the work done under this contract"
has ever been used.  This provision simply does not contemplate liability for the fire damage that
occurred while work was ongoing, as is the case here.

     What this provision does contemplate is liability for work that was completed.  This
provision is a classic limitation of a limited express warranty, despite Delta's attempts to couch

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 16
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. it as something different for the benefit of this case. One example of its application would be

2. installation of equipment. If, for example, Delta installed equipment worth $500,000 that was

3. defective, the replacement cost would be $500,000, but paragraph 6(d) would limit Delta's

4. exposure to $300,000. That type of claim would fall squarely within the meaning of the

5. limitation provision.

6.     Additional insight into the meaning of "work done under this contract" is provided by

7. considering what the provision does <u>not</u> say. What paragraph 6(d) does <u>not</u> say is "for all claims

8. <u>arising out of</u> the work done under this contract." This is the broader language discussed in

9. *Johnson* and *Smith-Bedrick* discussed above. It does <u>not</u> say "in respect to any vessel, directly

10. or indirectly in contract, tort, or otherwise, to its owners, for any injury to such vessel." *See*

11. *Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 55 (5th Cir. 1967). It does <u>not</u> say "for

12. any claim arising under this contract." *See Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674

13. F.2d 401, 409 n.2 (5th Cir. 1982).

14.     Moreover, there is nothing in paragraph 6(d) that suggests it applies to the situations

15. described in paragraph 4 (fire, theft, act of God). As discussed at length above, reading the

16. contract as a whole reveals that the subject matter of paragraphs 4 and 6 are distinct. Paragraph

17. 4 addresses damage to the vessel while work is ongoing, while paragraph 6 addresses problems

18. after the work is completed. *See supra* section III.A.i.a. There is nothing that relates the

19. $300,000 limit in paragraph 6(d) to damages of the nature addressed in paragraph 4. Paragraph

20. 6(d) limits its application to work already completed ("work done") whereas paragraph 4 relates

21. to "damage to the vessel."

22.     There is no reason that, if Delta wanted to limit its liability for instances such as the fire

23. giving rise to this suit, it could not have negotiated the necessary language. The law on

24. enforceability of limitation clauses such as this is well established. Courts have examined and

25. enforced "arising out of" clauses. Delta could have easily looked to case law for examples. *See,*

26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 17
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1.  *e.g.*, *Sander v. Alexander Richardson Investments*, 334 F.3d 712, 712 (8th Cir. 2003) ("[T]enant

2.  releases and discharges the landlord from any and all liability . . ."); *Coastal Iron Works, Inc. v.*

3.  *Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577, 581 (5th Cir. 1986) ("[W]e shall

4.  not be liable in respect to any one vessel or job, directly or indirectly in contract, tort, or

5.  otherwise . . . for any injury, loss, or damage to such . . .for any consequences thereto, to said

6.  owners."); *M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1490 (9th

7.  Cir. 1983) ("no claim arising from this transaction"); *Todd Shipyards*, 674 F.2d at 409 n.2 ("In

8.  no event shall our liability for any claim arising under this contract exceed . . ."); *Morton*, 695

9.  F.2d at 349 n.1 ("[The Yard] shall not, under any circumstances whatsoever, be chargeable with

10. or liable for damages, direct or consequential . . . by reason of the loss of, damage to . . . said

11. Vessel."); *Alamo Lumber Co. v. Warren Petroleum Corp.*, 316 F.2d 287, 290 (5th Cir.1963)

12. ("arising out of or in connection with or by reason of the work done' under the contract");

13. *American Agricultural Chemical Co. v. Tampa Armature Works, Inc.*, 315 F.2d 856, 857 (5th

14. Cir. 1963) ("arising out of or in connection with or by reason of the work done by Contractor");

15. *Fanning & Doorley Constr. Co. v. Geigy Chemical Corp.*, 305 F. Supp. 650, 652 (D.R.I. 1969)

16. ("all claims for injury or . . . arising out of the work done under this contract whether said claims

17. arise out of negligence or not").  Rather than using broad language such as these, Delta just

18. limited its damages exposure for "the work done."

19.       More illustrative, however, is that Delta actually used the broader "arising out of"

20. language elsewhere in the same contract.  Paragraph 3 provides that the vessel owner assumes

21. liability for "damage to, for, caused by, or <u>arising in connection with</u> work."  Paragraph 6(b)

22. exculpates Delta from liability for consequential damages "<u>arising out of, connected with, or</u>

23. <u>resulting from this contract</u>."  Paragraph 6(c) requires indemnification for damages "<u>which arise</u>

24. <u>out</u> of performance or malperformance of this Contract."  The fact that this type of language

25. appears thrice elsewhere in the contract demonstrates not only that Delta knew how to broaden

26.

1.   the scope of paragraph 6(d) if it intended to do so, but that paragraph 6(d) must mean something

2.   different.  If paragraph 6(d) was supposed to mean "arising out of work done under this

3.   contract," it would have said so.  This type of language, which is used elsewhere by Delta in this

4.   contract, is glaringly absent in paragraph 6(d).  That paragraph 6(d) does not say this clearly

5.   illustrates that the limitation was not meant to apply as broadly as paragraphs 3, 6(b), and 6(c).

6.   Unlike paragraphs 3, 6(b), and 6(c), paragraph 6(d) applies only to the actual work done,

7.   precisely as it so states.  This is a warranty provision for the actual work performed.  It does not

8.   apply more broadly to all consequences "arising from" this work, or "damage to the vessel."

9.        Finally, Delta could have followed the lead of other prominent shipyards.  *See M/V*

10.  *American Queen*, 708 F.2d at 1491 ("Evidence of custom and practice in the ship repair industry

11.  is certainly relevant to this case.").  Here are just a few examples:

12.       1.  Merrill Stevens Dry-Dock, Ship Repair Agreement:  [CONTRACTOR] shall
             not be liable, directly or indirectly, in tort, contract, or otherwise, to OWNER .
13.          . . **for any damage to the Vessel**.  Quoted in full in *Merrill Stevens Dry
             Dock, Co. v. M/V Yeocomico II*, 329 F.3d 809, 811-812 (11th Cir. 2003)
14.          (emphasis added).  *See also* Dixon Decl. ¶ 4.

15.       2.  Bradford Marine, Inc., Dockage and Repair Contract:  (b) injury . . to . . the
             Vessel . . . if **arising from work performed by the Company**.  *See* Dixon
16.          Decl., ¶ 4 (emphasis added).

17.       3.  Marine Max, Work Order and Ship Repair Contract:  OWNER agrees that it
             shall be *solely* responsible and liable for any losses . . . and further agrees that
18.          it will indemnify, protect and hold CONTRACTOR harmless from any and all
             claims, demands or suits that may be made against CONTRACTOR **arising
19.          by reason of the aforesaid**, irrespective of whether or not such losses . . . may
             have been caused by or resulted from or were contributed to by the fault or
20.          neglect or breach of contract of the CONTRACTOR. . .  Also Quoted in full in
             *Clear Marine Ventures, Ltd. v. Brunswick Corp., et al.;* Case No.: 08-22418-
21.          CIV-MORENO/TORRES; United States District Court of Florida, Miami
             Division, D.E. --, D.E. --. (emphasis added).  *See also* Dixon Decl., ¶4;
22.

23.       4.  Bender Shipbuilding & Repair Co., Inc.:  Bender's liability for **any and all
             claims arising out of or related to this Contract** shall not exceed the
24.          aggregate value of this Work Order. *See* Dixon Decl., ¶ 4. (emphasis added).

25.       5.  Malin International Ship Repair & Drydock, Inc.:  In no event shall MALIN
             INTERNATIONAL'S liability for any **claims arising under this contract**

26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 19
Case No. C07-1479 JCC

exceed in the aggregate the sum of $300,000.00. *See* Dixon Decl., ¶ 4 (emphasis added).

6. Charles Ferran & Co., Inc.: [W]e undertake to perform work on vessels and provide berth, wharfage, towage and other services and facilities only upon condition that we shall not be liable in respect to any one vessel, directly or indirectly in contract, tort or otherwise, to its owners, charterers or underwriters for any injury to such vessel, its cargo, equipment or movable stores, or for any consequences thereof. *Alcoa S.S. Co. v. Charles Ferran & Co.*, 242 F. Supp. 962, 965 (D.C. La. 1965), *judgment affirmed by Alcoa S.S.*, 383 F.2d 46. *See also* Dixon Decl., ¶ 4.

7. Pacific Fisherman Shipyard and Electric, LLC: IT IS AGREED THAT IN NO EVENT SHALL PFI'S AGGREGATE LIABILITY TO ALL PARTIES IN INTEREST AND ALL OTHER PERSONS FOR **ALL DAMAGES, INCLUDING, BUT NOT LIMITED TO, ANY TORT DAMAGES**, EXCEED $300,000.00. . . . *See* Dixon Decl., ¶ 2 (caps in original, bold added).

Delta did not choose to use any language similar to these other shipyards. The only conclusion that can be drawn based upon the plain language of the contract is that it did not intend for the limitation provision to be construed so broadly. Had Delta wanted a provision as broad as the examples above, it would have and could have used similar language, just as it did elsewhere in its contract.

          **b.**    **Even if Paragraph 6(d) is Ambiguous, it should be Construed against the Drafter.**

Plaintiffs maintain that the language of paragraph 6(d) is clear and does not apply to limit liability in this case. Were the Court to find that the language is ambiguous, however, its interpretation is to be construed against the drafter, and Plaintiffs interpretation should be adopted.

The determination whether a term in a maritime contract is ambiguous is a question of law for the court. *State Farm Mut. Auto. Inc. Co. v. Fernandez*, 767 F.2d 1299, 1301 (9th Cir. 1985). In reviewing a maritime contract to see if it is ambiguous, the court is to give terms their normal and everyday meaning. *In re Complaint of Johnson*, 2006 U.S. Dist. LEXIS 2987 (S.D. Al. 2006) (citing *Sander*, 334 F.3d at 712). A word or phrase is ambiguous when it is capable of more than one meaning. *Id.*; *U.S. ex rel. Eastern Gulf v. Metzger Towing*, 910 F.2d 775, 782

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 20
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. (11th Cir. 1990); *Mobil Exploration & Producing U.S., Inc. v. A-Z/Grant Int'l Co.*, 1992 U.S.

2. Dist. LEXIS 11766 at *24, 1993 A.M.C. 1137 (E.D. La. 1992); *Kennewick Irrigation Dist. v.*

3. *United States,* 880 F.2d 1018, 1032 (9th Cir. 1989).  Importantly, the fact that the parties dispute

4. a contract's meaning does not establish that the contract is ambiguous." *Kennewick*, 880 F.2d

5. at1032, (citing *International Untion of Bricklayers & Allied Craftsman Local No. 20 v. Martin*

6. *Jaska, Inc.,* 752 F.2d 1401, 1406 (9th Cir. 1985)).

7.      Under federal maritime law, the parol evidence rule prohibits the court from considering

8. extrinsic evidence to aid in the interpretation of a contract unless the contract is ambiguous.

9. *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26-27 (2d Cir. 1988).  Where a contract is

10. ambiguous, however, the parol evidence rule is inoperative and extrinsic evidence is used to

11. determine what the terms of the agreement are.  *Id.* at 27; *F.W.F., Inc. v. Detroit Diesel Corp.*,

12. 494 F.Supp.2d 1342, 1360 (S.D. Fla. 2007).

13.      Where the court must look to extrinsic evidence to determine the parties' intent with

14. respect to an ambiguous contract, there is a question of fact that precludes summary judgment.

15. *Mobil Exploration*, 1992 U.S. Dist. LEXIS 11766 at *24 (quoting *Garza*, 861 F.2d at 26); *see*

16. *also American Stevedores, Inc. v. Porello*, 330 U.S. 446, 457-58 and *Offshore-Inland*, 2007 U.S.

17. Dist. LEXIS 73534.

18.      In the event that extrinsic evidence of the parties' intent does not resolve the ambiguity,

19. or in the event that there is no such evidence of the parties' intent, the court may look to

20. traditional rules of contract construction that have been incorporated into the federal maritime

21. law.  *In re Complaint of Johnson*, 2006 U.S. Dist. LEXIS 2987 at *11.  One such maxim that is

22. well established in admiralty law as well as in contract law more generally, holds that

23. ambiguities in a contract are to be construed against the drafter.  *St. Paul Fire & Marine Ins. Co.*

24. *v. Lago Canyon, Inc.*, 561 F.3d 1181, 1191 n.19 (11th Cir. 2009); *Navieros Oceanikos, S.A. v.*

25. *S.T. Mobil Trader*, 1977 A.M.C. 739 (2d Cir. 1977).

26.
PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 21
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1.    For example, in *Johnson*, where an indemnity provision was susceptible to two

2.   reasonable constructions and the parties offered no evidence or argument as to how to resolve

3.   the ambiguity, the court relied on this maxim and construed the provision against the party who

4.   drafted the agreement.  2006 U.S. Dist. LEXIS 2987 at *16-17; *see also Navieros Oceanikos*,

5.   1977 A.M.C. 739.

6.    As previously discussed, the repair contract provides, in pertinent part, the following

7.   language with regard to its limitation of warranties and damages:

8.         IN NO EVENT SHALL YARD'S AGGREGATE LIABILITY **FOR THE
           WORK DONE UNDER THIS CONTRACT** TO ALL PARTIES IN

9.         INTEREST EXCEED IN THE AGGREGATE THE SUM OF $300,000 OR THE
           SUM RECEIVED BY THE YARD UNDER THIS REPAIR CONTRACT,

10.        WHICHEVER IS LESS.

11.   Repair Yard Order, ¶ 6(D) (caps in original; underline added).  Plaintiffs maintain that the

12.   phrase "work done under this contract" means just what it says, the actual work by Delta in

13.   performing vessel repairs pursuant to the agreement.  Under this interpretation, the occurrence of

14.   the fire, which was not in an area where the repairs were being performed by Delta, and the

15.   damages stemming from the fire would not be subject to this damage limitation.  Delta, on the

16.   other hand, contends that the phrase "work done under this contract" should be interpreted more

17.   broadly to include all activities that occurred while the vessel was at Delta's yard and all

18.   damages arising from work done by Delta, such that the fire and resulting damages would be

19.   governed by this provision and thereby limited to no more than $300,000 or the value of the

20.   repair contract, whichever is less.

21.    Neither the term "work" nor the phrase "work done under this contract" are defined

22.   anywhere in the contract.  Plaintiffs maintain that the provision has only one meaning (*see supra*

23.   section III.A.i.4) and that Delta's "interpretation" is not fair and reasonable such as to create an

24.   ambiguity.  However, if this Court finds that this provision is susceptible of two fair and

25.   reasonable interpretations, it is ambiguous as a matter of law under the standard set forth above.

26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 22
Case No. C07-1479 JCC

**HOLMES WEDDLE & BARCOTT**
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1.  *Lloyd's of London v. Pagan-Sanchez*, 539 F.3d 19, 22 (1st Cir. 2008); *Garza*, 861 F.2d at 27.

2.  As such, this ambiguity could present an issue of fact that precludes summary judgment. *Garza*,

3.  861 F.2d at 26; *Offshore-Inland Services*, 2007 U.S. Dist. LEXIS 73534 at *21.

4.  However, in light of the fact that the Delta has not presented any extrinsic evidence that

5.  would assist the Court in determining the parties' intent with respect to the meaning of this

6.  ambiguous phrase, the Court may rely on the maxim that any ambiguity in the contractual

7.  language is to be construed against the drafter. *In re Complaint of Johnson*, 2006 U.S. Dist.

8.  LEXIS 2987 at *11.  Applying this traditional admiralty rule of construction in the present case,

9.  any ambiguity in the phrase "work done under this contract" must be construed against Delta as

10. the party who drafted the agreement, and Plaintiffs' interpretation of the phrase should prevail.

11. In sum, there is no provision contained within the Repair Yard Order that either

12. exculpates or limits Delta's liability for the fire that destroyed MARJORIE MORNINGSTAR

13. and Plaintiffs' compensatory damages sustained as a result.  The parties could have negotiated

14. language that would have limited Delta's liability in a situation such as the fire aboard the

15. MARJORIE MONINGSTAR, but they did not.  There is simply no language in the agreement

16. that says what Delta wishes it did.  Plaintiffs are therefore entitled summary judgment on this

17. issue.

18. **ii.   At a Minimum, Delta's Motion for Partial Summary Judgment Should be
     Denied because there are Genuine Issues of Material Fact regarding Whether**

19. **Delta Acted with Gross Negligence.**

20. If the Court denies Plaintiffs' motion for partial summary judgment regarding the

21. limitation provision's applicability, Plaintiffs request that the Court also deny Delta's motion for

22. partial summary judgment because there are issues of fact relating to enforceability of the

23. provision.  There is a genuine issue as to whether Delta acted with gross negligence.  This issue

24. is material to the outcome of this case.  Thus, Delta's summary judgment motion should be

25. denied separately on that basis.

26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 23
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1.        Under controlling Ninth Circuit precedent, a party to a maritime contract cannot shield

2. itself contractually from liability for gross negligence. *Royal Ins. Co. of America v. Southwest*

3. *Marine*, 194 F.3d 1009, 1016 (9th Cir. 1999). *See also M/V American Queen*, 708 F.2d at 1488.

4. In *Royal*, the court considered the issue of whether a shipyard could limit its liability under a

5. vessel repair contract for damage to a vessel as a result of the yard's gross negligence. The court

6. found that the vessel owner presented sufficient evidence to establish a colorable claim of gross

7. negligence, and then went on to hold that the while the exculpatory clause in the repair contract

8. was enforceable with regard to the shipyard's negligence, the clause was not enforceable with

9. respect to gross negligence. *Id.* at 1015-16.

10.        What constitutes gross negligence in a particular case is a question of fact which, in an

11. admiralty case, is to be determined under applicable state law. *Royal*, 194 F.3d at 1015; *Nist v.*

12. *Tudor*, 67 Wash.2d 322,326, 407 P.2d 798 (Wash. 1965) (under Washington law, existence of

13. gross negligence is a question of fact for jury). "Gross negligence" has not been statutorily

14. defined in Washington. Washington Pattern Jury Instructions, however, define "gross

15. negligence" as

16.     [T]he failure to exercise slight care. It is negligence that is substantially greater
    than ordinary negligence. Failure to exercise slight care does not mean the total

17.     absence of care but care substantially less than ordinary care.

18. WPI 10.07; *see also Liberty Furniture, Inc. v. Sonitrol of Spokane, Inc.*, 53 Wash. App. 879,

19. 881-82 (1989) (quoting *Conradt v. Four Star Promotions, Inc.*, 45 Wash. App. 847, 852

20. (1986)). In turn, "failure to exercise slight care" means "not the total absence of care but care

21. substantially or appreciably less than the quantum of care inhering ordinary negligence." *Nist v.*

22. *Tudor*, 67 Wash.2d 322, 331 (1965). In other words, actions that a reasonable person would

23. realize are "highly dangerous." *Liberty Furniture, Inc.*, 53 Wash. App. at 881-82. Gross

24. negligence is in essence "a species of aggravated negligence." *Nist*, 67 Wash.2d at 332. It lies

25. "somewhere between negligence and willful or wanton misconduct." *Liberty Furniture, Inc.*, 53

26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 24
Case No. C07-1479 JCC

Wash. App. at 882.  Examples of gross negligence include a bus driver hitting a drunken pedestrian, *Rice v. Employment Sec. Dep't*, 1999 Wash. App. LEXIS 161 (Wash. Ct. App. 1999), and failure of a security company to notify its customer of a sprinkler malfunction, *Liberty Furniture, Inc.*, 53 Wash. App. at 881-82.

To raise an issue of gross negligence sufficient to survive summary judgment, there must be substantial evidence of serious negligence. *Nist*, 67 Wash.2d at 332.  If there is substantial evidence of seriously negligent acts or omissions, then the issue of gross negligence is a question of fact that should be left for the jury. *Nist*, 67 Wash.2d at 332.

To determine the degree of negligence, a court must look to the hazards of the situation that confront the actor. *Nist*, 67 Wash.2d at 331.  In *Nist*, for instance, the court looked to the defendant driver's failure to consider the hazards associated with turning left in front of an on-coming vehicle.  The court found that turning into such an "obvious danger" amounted to "evidence from which a jury could infer that [the defendant] acted in the exercise of so small a degree of care under the circumstances as to be substantially and appreciably more negligent than ordinary, and hence could be held guilty of gross or great negligence." *Id.* at 332.

Here, there is substantial evidence that Delta acted with serious/gross negligence.  The hazard confronting Delta was the destruction of a multimillion dollar yacht.  Fortunately, there was no injury or death, but there easily could have been.  Delta violated federal law by not having a written fire plan in place. *See* Faherty Report at 4, attached to Faherty Decl..  Fire Investigator Richard F. Carman, consulted by Plaintiffs, has provided his opinion that it is "standard procedure" when a fire alarm is disabled for a "fire watch" to be assigned and on duty constantly. *See* Carman Supplemental Summary Report, at 1, to Carman Decl.  Delta did not have a fire watch. *See* Delta's Responses to Plaintiffs' 1st ROGs and 2nd RFP (admitting they did not have a fire plan).  Mr. Carman opines that when Delta employees became aware that the fire alarm system was not operating, "all work should have stopped, any possible sources of

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. ignition of fire should have been eliminated and no work should have been performed until

2. either the fire alarm system was made fully operational or a 'Fire Watch' was established and

3. maintained until the fire alarm system was fully operational." Carman Supplemental Summary

4. Report, at 2. Delta was aware of the "Fire Watch" program and had implemented it in the past.

5. *Id.* It would be "only prudent" if the individuals responsible for the work and protection of the

6. ship knew the operational ability of the fire alarm system and required a "Fire Watch." *Id.* at 3.

7. He opines that had the fire alarm system been operating, the personnel working there would

8. have been alerted earlier and the incipient fire could have been contained and less damage

9. sustained. *Id.* at 3. In sum, Mr. Carman opines that,

> The failure of the Delta Marine Industry employees, responsible for the Marjorie Morningstar vessel, while at their facility, to either repair the fire alarm system to insure it was operational, or establish a Fire Watch procedure until the system was operational, **was substantially below the norm of ordinary care or even slight care.**

13. *Id.* at 3 (emphasis added).

14.     Plaintiffs' shipyard electrical expert, Mr. Arthur Faherty, also provides evidence of

15. Delta's serious/gross negligence. Mr. Faherty first notes that it is customary for a shipyard and

16. vessel to meet and discuss fire protection when a vessel arrives in the yard. *See* Faherty Report,

17. at 3. Delta knew that the fixed fire fighting system for the engine room had been disabled, and

18. that the fire alarm system for the vessel was compromised, yet did not implement temporary fire

19. detection or fire watch. According to Mr. Faherty, this failure of Delta fell below the standard of

20. care and worsened the damage to the vessel. *Id.* Second, the alarms that Delta had in its facility

21. were located too far from the vessel to detect contained fires such as the one that occurred here.

22. *Id.* at 4. This also fell below the standard of care and worsened the damage to the vessel. *Id.*

23. Third, OSHA requires protection from fire hazards in shipyards and a written safety plan to be

24. implemented. *Id.* Delta admittedly did not have a written plan or training, which caused

25. extensive damage on the MARJORIE MORNINGSTAR. *Id.* Finally, Mr. Faherty noted that

26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 26
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. "[Delta] was allowing an employee do to major electrical work on a vessel without a plan, or

2. procedures, in place for oversight of critical work," which "denied the Marjorie Morningstar the

3. protection normally afforded a vessel in a marine facility." *Id.* at 5.  In conclusion, Mr. Faherty

4. opines that "Delta Marine Services failed to take basic safety steps and violated safety standards

5. expected of shipyards, resulting in a fire that caused a total destructive loss." *Id.* at 3.

6.     The opinions of Fire & Explosion Investigator Paul V. Fleury, consulted by Defendant

7. Leviton, also evidence gross negligence.  Plaintiffs' experts, Messrs. Carman and Faherty,

8. concur with Mr. Fleury's opinions in this regard.  *See* Carman and Faherty Declarations.  Mr.

9. Fleury found numerous electrical configurations that "[left] the vessel in a very electrically

10. dangerous condition."  *See* Faherty Decl., ¶ 5  This included the 100 AMP three phase power

11. cable grounding connector, the 50 AMP 208/120 volt shore power cable grounding conductor,

12. and "improper dangerous splices ".  *Id.*  Mr. Fleury felt that Mr. Sinclair was a "very unqualified

13. individual" who "demonstrated an unbelievably low skill and knowledge level for his position,"

14. and should not have permitted to be the lead electrical engineer on a project such as the

15. MARJORIE MORNINGSTAR.  *Id.*; *see* Carman Decl., ¶ 5.  The number of problems associated

16. with the temporary shore power cord was "staggering."  Carman and Faherty Decls., at ¶ 5.

17.     As evidenced by the opinions of Messrs. Carman, Faherty, and Fleury, Delta's actions

18. created an "obvious danger."  With an incompetent worker performing the electrical work, with

19. no ship-wide functioning fire alarm system, with no fire watch, with no knowledge of the

20. purpose of an isolation transformer, with no written fire safety plan as required by federal law,

21. with a poorly wired ad hoc electrical system, the shore power was energized and Mr. Sinclair

22. walked away from the vessel.  *See* Sinclair Dep., at 76:9-15.  Delta will be hard pressed to point

23. to <u>anything</u> that it did to prevent this fire.  A jury could easily infer that Delta acted "in the

24. exercise of so small a degree of care under the circumstances as to be substantially and

25. appreciably more negligent than ordinary, and hence could be held guilty of gross or great

26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 27
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. negligence." *Nist*, 67 Wash.2d at 332.  Delta's actions placed the MARJORIE

2. MORNINGSTAR in a "very electrically dangerous condition." *See* Faherty, ¶ 5.  Delta's

3. summary judgment motion must be denied so that the issue of gross negligence can be properly

4. presented to the jury. *Nist*, 67 Wash.2d at 332.

5. **B.     Indemnification Provision.**

6.        Delta argues that the Repair Yard Order requires Lindeza to defend and indemnify Delta

7. from the claims of Leviton and the Wards.  Again, Delta has misread the terms of its own

8. agreement.  The language of the Repair Yard Order does not require Lindeza to indemnify and

9. defend Delta under the circumstances of this case.  Because the terms of the agreement are clear,

10. Lindeza is entitled to summary judgment that it is not required to defend and indemnify Delta in

11. this case.

12.        **i.     Summary Judgment should be Granted in Favor of Plaintiffs Holding that the**
        **Indemnification Provision does not Apply.**

13.        As discussed above, the Repair Yard Order must be read as a whole, and a court may not

14. look beyond the written language of the contract to determine the intent of the parties unless the

15. disputed language is ambiguous. *Fontenot*, 791 F.2d at 1214.  The indemnification provision

16. upon which Delta relies to argue that Lindeza must defend and indemnify it from the claims of

17. Leviton and the Wards provides, in pertinent part:

18.
19.        Owner shall indemnify and hold harmless Yard . . . from any claim . . . for any
        physical damage to property or loss thereof which arises out of performance or
        malperformance of this Contract **and is caused by Owner**, including its
20.        subcontractors and its and their employees, agents, suppliers, in whole or in part
        or jointly with the Yard, unless proximately caused solely by the negligence or
21.        willful misconduct of the Yard.

22. Repair Yard Order (emphasis added).  Delta entirely overlooks the triggering language of this

23. provision that requires the damage be caused by the vessel owner or its subcontractors.  This

24. provision is obviously intended to cover the situation in which the vessel is in the yard being

25. worked on by Delta <u>and</u> also being worked on by the owner or its subcontractors.  Delta rightly

26.
PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 28
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. wants to limit its liability in that situation only to its own mistakes.  Neither Lindeza nor anyone

2. on behalf of Lindeza was doing any work on the vessel that could have caused the fire.  The only

3. "players" are Delta, Leviton, and some unknown installer of the receptacle.[2]  While it was in

4. Delta's yard, nothing and no one connected to Lindeza did work on the vessel.

5.     Moreover, even assuming *arguendo* Lindeza did contribute to the cause of the fire, the

6. provision eliminates the duty to defend and indemnify where the damage was "proximately

7. caused solely by the negligence or willful misconduct of the Yard."  If Lindeza played any part

8. in causing the fire aboard the MARJORIE MORNINGSTAR, certainly Delta's own conduct was

9. the proximate cause, and Lindeza's was only ancillary.  Delta's only claim that Lindeza caused

10. the fire is that Captain Preacher should have talked to the Yard about the shore power

11. connection.  Even if Captain Preacher did not do this, and even if this failure contributed to the

12. fire, it was Delta's actions that were the proximate cause of the fire.  *Commodities Reserve Co.*

13. *v. St. Paul Fire & Marine Ins. Co.*, 879 F.2d 640, 643 (9th Cir. 1989) ("Proximate cause in

14. marine cases is defined as 'that cause most nearly and essentially connected with the loss as its

15. efficient cause.'").

16.     Because Lindeza did not cause the fire, nor did any of its subcontractors (because there

17. were none), the indemnification provision does not, on its face, apply here.  Even assuming

18. *arguendo* Lindeza contributed to the fire, Delta's actions were the proximate cause of the fire

19. and the indemnification provision still does not apply, on its face, to the facts of this case.

20. Plaintiffs are therefore entitled to summary judgment on the issue of whether it is obligated to

21. defend and indemnify Delta from claims against Leviton and/or the Wards.

22.

23.

24. ——————————

25. [2] Delta argues that Direktor-Gunnell is a responsible party.  Plaintiffs have no evidence that Direktor-Gunnell was actually the entity that installed the receptacle, nor does Delta.

26.

1.       **ii.    At a Minimum, Delta's Motion for Partial Summary Judgment Regarding Indemnification Should be Denied because there are Genuine Issues of Material**

2.                **Fact Regarding Gross Negligence.**

3.       If the Court denies Plaintiffs' motion for partial summary judgment regarding the

4. indemnification provision, Plaintiffs request that the Court also deny Delta's motion for partial

5. summary judgment because there is a genuine issue of material fact as to whether Delta acted

6. with gross negligence.

7.       As discussed above, under Ninth Circuit precedent, a party to a maritime contract cannot

8. shield itself contractually from liability for gross negligence. *Royal Ins.*, 194 F.3d at 1016. *See*

9. *also M/V American Queen*, 708 F.2d at 1488. This doctrine applies to limitation provisions and

10. indemnification provisions alike. *Becker v. Tidewater Inc.*, 586 F.3d 358, 367 (5th Cir. 2009).

11.       As discussed above, there is substantial evidence that Delta acted with

12. serious/gross negligence here. *See supra* section III.A.ii. Because there is substantial evidence

13. of serious/gross negligence, should the court deny Plaintiffs' motion for partial summary

14. judgment regarding the indemnification provision, Delta's summary judgment motion should be

15. denied so that the issue of gross negligence can be properly presented to the jury. *Nist*, 67

16. Wash.2d at 332.

17. **C.    Joint and Several Liability.**

18.       Delta requests the court grant summary judgment holding that Delta and Leviton cannot

19. be subject to joint and several liability. Determining whether Delta and Leviton are jointly and

20. severally liable, however, requires factual determinations to be made. Summary judgment is

21. thus inappropriate and should be denied on this issue.

22.       Under Washington law, Delta and Leviton are jointly and severally liable. Revised Code

23. of Washington 4.22.070 provides, in relevant part:

24.         (1) In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity

25.         which caused the claimant's damages . . . . The sum of the percentages of the total fault attributed to at-fault entities shall equal one hundred percent. The

26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 30
Case No. C07-1479 JCC

entities whose fault shall be determined include the claimant or person suffering personal injury or incurring property damage, defendants, third-party defendants, entities released by the claimant, entities with any other individual defense against the claimant, and entities immune from liability to the claimant. . . . Judgment shall be entered against each defendant except those who have been released by the claimant or are immune from liability to the claimant or have **prevailed on any other individual defense against the claimant** in an amount which represents that party's proportionate share of the claimant's total damages. The liability of each defendant shall be several only and shall not be joint except:

. . .

(b) If the **trier of fact** determines that the claimant or party suffering bodily injury or incurring property damages was not at fault, the defendants against whom judgment is entered shall be jointly and severally liable for the sum of their proportionate shares of the claimants [claimant's] total damages.

(Emphasis added). Multiple defendants are jointly and severally liable in situations where the claimant is fault-free. In addition, no defendant that prevails on a personal defense can be subject to joint and several liability.

Delta presents the court with three arguments in support of its request for summary judgment on this issue. First, it argues that Plaintiffs are not fault-free, thus Delta and Leviton cannot be jointly and severally liable. Second, Delta argues that the absence of Direktor-Gunnell prevents joint and several liability. Third, Delta argues that it is not subject to joint and several liability if it successfully enforces the limitation provision. Each argument is flawed.

### 1.   Whether Plaintiffs are Fault-Free is a Question of Fact.

It is true that if Plaintiffs are found at fault, under RCW 4.22.070, Delta and Leviton cannot be held jointly and severally liable. Negligence, however, is typically an issue for the jury, and this case is no exception. *See, e.g, Christensen v. Georgia-Pacific Corp.,* 279 F.3d 807, 813 (9th Cir. 2002); *Wyler v. Holland Am. Line - United States, Inc.*, 348 F. Supp. 2d 1206, 1209 (W.D. Wash. 2003). In this case, Delta will attempt to prove that Lindeza should have intervened in the shipyard work. Evidently, their argument is that the work was done so negligently that the owner should have seen the problems and directed Delta on how to do its

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 31
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. work.  Whatever the merits of this facially absurd defense, whether Plaintiffs' actions fell below

2. the standard of care owed is for a jury to decide.  *Chrisensen,* 279 F.3d at 813; *Wyler,* 348 F.

3. Supp.2d at 1209 (same).  If a jury finds that Plaintiffs are at fault, Lindeza agrees that Delta and

4. Leviton cannot be jointly and severally liable.  If, however, a jury finds that Plaintiffs are fault-

5. free, Delta and Leviton are jointly and severally liable.  *See* RCW 4.22.070(1)(b).  Whether

6. Plaintiffs are fault-free is therefore material, and Delta's motion for summary judgment on the

7. issue of joint and several liability should be denied.

### 2. Delta's Argument that the Absence of Direktor-Gunnell Prevents Joint and Several Liability is Without Merit.

9. Delta argues that <u>even if</u> Plaintiffs are fault-free, there is can be no joint and several

10. because Direktor-Gunnell is not a party to the suit.  *See* Motion at 11.  Notably, Delta cites no

11. law in support of this proposition.  The statute clearly contemplates the absence of a responsible

12. party, and nonetheless provides joint and several liability.

13. Subsection (1) states that fault should be allocated to all "entities," including the

14. claimant, defendants, and other entities.  The only possible entities other than claimant and

15. defendants are non-party entities.  Conversely, subparagraph (b) provides that all "defendants"

16. shall be jointly and severally liable.  Subparagraph (b) conditions joint and several liability on a

17. fault-free plaintiff, but it does <u>not</u> condition joint and several liability on all responsible entities

18. being parties to the suit.  As evidenced by subsection (1), the drafters clearly contemplated

19. responsible non-parties, and nonetheless provided for joint and several liability among all

20. <u>defendants</u>, regardless of any responsible non-party entities.  Direktor-Gunnell's absence

21. therefore has no bearing on whether Delta and Leviton are jointly and severally liable.

22. Even if the court agrees with Delta that a responsible party's absence forecloses the

23. possibility of joint and several liability, there is absolutely no evidence that Direktor-Gunnell is

24. actually a responsible party.  While negligence is typically an issue of fact left for the jury,

25. where there is no evidence whatsoever from which a jury could reasonably find negligence,

26. PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 32
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1. summary judgment is appropriate. *See, e.g. Nelson v. Pima Community College,* 83 F.3d 1075,

2. 1081-1082 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for

3. purposes of summary judgment."); *Deans v. CSX Transp., Inc.,* 152 F.3d 326 (4th Cir. 1998).

4. Because Delta has not (and is unable) to produce evidence that Direktor-Gunnell is liable,

5. summary judgment on this issue is appropriate. There is no absent responsible party, and Delta

6. and Leviton are jointly and severally liable.

7.    **3.    Delta's Argument that Enforcement of a Limitation Provision Precludes Joint and Several Liability is also Without Merit.**

8. Delta's final argument is that a party cannot be subject to joint and several liability where

9. they enforce a limitation of liability clause. Delta's argument requires a two-step analysis. Step

10. one, under subsection (1) "judgment" cannot be entered against Delta. Step two, since no

11. "judgment" under subsection (1) is entered against Delta, subsection (1)(b) does not apply.

12. To make this argument, Delta relies on the language in subsection (1) that provides,

13. "Judgment shall be entered against each defendant except those who . . . have prevailed on any

14. other individual defense against the claimant." Delta argues that a enforcing a limitation clause

15. falls within the meaning of "prevailed on any other individual defense." This is nonsensical and

16. leads to absurd results. Under this interpretation, no judgment could be entered against Delta,

17. even up to the $300,000 it evidentlt admits it may owe Lindeza. Without a judgment entered

18. against that defendant, a plaintiff would not be able to collect damages. This would, in effect,

19. convert all limitation clauses into exculpatory clauses.

20. Under Delta's interpretation, any affirmative defense would defeat joint and several

21. liability. Taking into account other affirmative defenses further illustrates the ineffectiveness of

22. Delta's proposed interpretation. Consider the affirmative defense of amounts already paid that

23. entitle the defendant to a set-off. Under Delta's interpretation, by successfully claiming the right

24. to set-off amounts already paid, a defendant would not be subject to a judgment or joint and

25. several liability. This is again an absurd result.

26.
PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 33
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

The more appropriate interpretation of "other individual defense" is a defense to <u>liability</u>, not a defense to <u>damages</u>. Such defenses include statute of limitations, inadequate service of process, absence of personal jurisdiction, and failure to file a claim. *See Nelson v. Schnautz,* 141 Wn. App. 466, 479 n. 4 (2007); *Ambassador Programs, Inc. v. E.I.L., Ltd.*, 2007 U.S. Dist. LEXIS 10378 (E.D. Wash. Feb. 13, 2007) ("Being dismissed for lack of personal jurisdiction and insufficient service of process constitutes "prevail[ing] on any other individual defense."). *See also* Gregory C. Sisk, *Interpretation of the Statutory Modification of Joint and Several Liability: Resisting the Deconstruction of Tort Reform*, 16 Puget Sound L. Rev. 1, 59-60 (1992) (noting that "individual defenses" refers to "such threshold defenses as the statute of limitations, inadequate service of process, or absence of personal jurisdiction over that entity."). This interpretation is logical. No judgment whatsoever can be entered against a defendant succeeding on liability defenses. Under this interpretation, the analytical structure provided in RCW 4.22.070 can be carried out seamlessly.

This interpretation also finds support in the very words of the statute. What Delta glosses over is the word "other" – "Judgment shall be entered against each defendant except those who have been released by the claimant or are immune from liability to the claimant or have prevailed on any <u>other</u> individual defense against the claimant." By using the word "other," the drafters indicated that the individual defenses to which they were referring are those similar in nature to being released or immune. Under the doctrine of *ejusdem generis*, the listing of examples of complete bars to recovery expresses the drafters' intent that only complete bars to recovery are contemplated in this section. The statute refers to individual complete defenses under which the defendant cannot be held liable at all.

*Tegman v. Accident & Med. Inves., Inc.,* 150 Wn.2d 102, 117 (Wash. 2003), upon which Delta relies, is inapposite. *Tegman* addresses the question of whether a negligent tortfeasor can be jointly and severally liable for damages arising from intentional conduct. *Id.* There is no

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 34
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008

1.  discussion of the meaning and/or effect of the "individual defense" language. *Tegman* offers

2.  nothing to resolve the issues of this case. If anything, *Tegman* offers support for Plaintiffs

3.  interpretation. In dicta, the *Tegman* court notes that "the proportionate shares of released

4.  parties, those with individual defenses, and immune parties are not included and will not be part

5.  of the joint and several liability calculation." It is noteworthy that "those with individual

6.  defenses" are treated the same as those who have been released or have immunity. The target of

7.  subsection (1) was to remove from joint and severability calculation those parties who are no

8.  longer obligated to pay <u>anything</u> to plaintiff.

### IV.   CONCLUSION

10.      For the foregoing reasons, Plaintiffs request that summary judgment be granted in their

11.  favor holding (1) the limitation provision does not apply to limit Delta's liability for damages

12.  resulting from the fire, and (2) the indemnification provision does not apply. In the alternative,

13.  Plaintiffs request that Delta's motion for summary judgment on these same issues be denied.

14.  Plaintiffs also request that Delta's motion for partial summary judgment holding that Delta and

15.  Leviton are not jointly and severally liable be denied.

16.      DATED this _22_ day of February, 2010.

17.                     HOLMES WEDDLE & BARCOTT, P.C.

19.                    /s/ Michael Barcott

20.                    Michael A. Barcott, WSBA #13317
                  Theresa K. Fus, WSBA #37984

21.                    999 Third Avenue, Suite 2600
                  Seattle, Washington 98104

22.                    Telephone: (206) 292-8008
                  Facsimile:  (206) 340-0289

23.                    Email: mbarcott@hwb-law.com
                  Attorney for Plaintiff

26.  PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 35
Case No. C07-1479 JCC

1.

CERTIFICATE OF SERVICE

2.

The undersigned certifies under penalty of perjury
of the laws of the State of Washington that, on the

3.

_22_ day of _February_ , ~2008,~ 2010
the foregoing was electronically filed with the Clerk

4.

of Court using the CM/ECF system, which will send
notification of such filing to the following:

5.

**Attorney for Defendant Delta Marine Industries, Inc.**

6.

Donald K. Mclean
Bauer Moynihan & Johnson, LLP

7.

2101 Fourth Avenue, Suite 2400
Seattle, WA 98121

8.

**Attorney for Defendant Leviton Manufacturing Co.**

9.

Ronald C. Gardner
Gardner Bond Trabolsi McDonald & Clement

10.

2200 6TH Avenue, Suite 600
Seattle, WA 98121

11.

**Co-counsel for Plaintiffs**

12.

Krista Fowler Acuña
Raúl J. Chacón Jr.

13.

HOUCK ANDERSON P.A.
200 S. Biscayne Blvd., Ste. 300

14.

Miami, FL 33131

15.

16.

_Tanya Garbell_
Tanya Garbell

17.

18.

G:\4923\21711\Pleading\Opp & Cross FINAL 2.22.10.doc

19.

20.

21.

22.

23.

24.

25.

26.

PLAINTIFFS' OPPOSITION TO DELTA'S PARTIAL S.J.
AND CROSS-MOTION FOR PARTIAL S.J. - 36
Case No. C07-1479 JCC

HOLMES WEDDLE & BARCOTT
999 THIRD AVENUE, SUITE 2600
SEATTLE, WASHINGTON 98104-4011
TELEPHONE (206) 292-8008